IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

| | | |
|---|---|---|
| GULF RESTORATION NETWORK | § | PLAINTIFF |
| | § | |
| V. | § | CAUSE NO. 1:08cv186-LG-RHW |
| | § | |
| HANCOCK COUNTY | § | |
| DEVELOPMENT, LLC | § | DEFENDANT |

## MEMORANDUM OPINION AND ORDER
## GRANTING PARTIAL SUMMARY JUDGMENT

BEFORE THE COURT is Plaintiff Gulf Restoration Network's [58] Motion for

Partial Summary Judgment. Gulf Restoration initiated this citizen lawsuit under the

Clean Water Act for alleged violations related to a construction project on Defendant

Hancock County Development, LLC's property. Gulf Restoration argues (1) Hancock

violated the CWA through non permitted storm water runoff and (2) dredging and

filling of wetlands, and (3) Gulf Restoration has standing. Hancock did not timely

respond[1] and was not entitled to a Rule 56(d) continuance. The Court has considered

the parties' submissions and the relevant legal authority. The motion is granted.

## FACTS AND PROCEDURAL HISTORY

Gulf Restoration "is a network of environmental, social justice, and citizens'

groups and individuals committed to restoring the Gulf of Mexico to an ecologically and

biologically sustainable condition." (Sarthou Decl. at ¶4). Gulf Restoration's "mission

---

[1]Hancock's response was filed six months and eleven days later and was found
in its Opposition to the Motion for Ruling on Summary Judgment. Nevertheless, since
there is no prejudice to Gulf Restoration, the Court considered it.

is to protect and restore the resources of the Gulf Region for future generations." *Id.* at ¶6. Gulf Restoration's members include Kevin and Chrissy Schuengel and Lawrence Lang.

The Schuengels and Lang are neighbors residing on Bayou La Croix Road in Hancock County, Mississippi, just south of Hancock's property.  Lang is also Mrs. Schuengel's father.  The Schuengels' property line is two hundred yards south of Hancock's property line.  Between the two is land belonging to Mrs. Schuengel's family, to a portion of which she is an heir and the use of which the Schuengels enjoy.  Lang's property borders a portion of Hancock's.

Bayou Maron's tributary runs along the western border of Hancock's property and then flows through Lang's property from the north.  The tributary empties into Bayou Maron, emptying into Bayou La Croix, emptying into the Jourdan River, emptying into the Bay of St. Louis, emptying into the Gulf of Mexico.

Hancock is a limited liability company that owns more than seven hundred acres north and south of Interstate 10.  Eastern portions of the property lie in the City of Bay St. Louis, while the majority lies in the county.  Seven hundred three acres are located south of the Interstate.  A large portion of Hancock's property consists of freshwater/forested shrub wetlands, with few freshwater emergent wetlands and non-wetlands.  Hancock intended to build on its property a planned community development, the Town of Stennis.  This included building on the wetlands.

In the weeks before May 2007, Hancock began to go through with its construction plans by building canals, ditches, berms, dams, and roads, and filling,

2

clearing, and dredging wetlands on Hancock's property. Hancock never obtained permits to dredge or fill wetlands nor to discharge storm water runoff. On November 2, 2007, the United States Army Corps of Engineers issued a Notice of Violation to Hancock. The violations cited were for unauthorized filling and dredging of wetlands associated with the construction project. The notice ordered Hancock to halt its construction activities, asked for information to help the Corps decide how to resolve the matter, and stated that the Corps was sending the letter to certain state and federal agencies for their input on how to resolve the violations. Hancock thereafter installed silt fencing, pursuant to the Corps's directives, as an interim protective measure.

## DISCUSSION

A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must view the evidence in the light most favorable to the non-moving party. *Abarca v. Metro. Transit Auth.*, 404 F.3d 938, 940 (5th Cir. 2005). A "material fact" is one that might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute about a material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.*

The party that bears the burden of proof at trial also bears the burden of proof at the summary judgment stage. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A party seeking summary judgment bears the initial burden of identifying those

3

portions of the pleadings and discovery on file, together with any affidavits, which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 325. Once the movant carries its burden, the burden shifts to the non-movant to show that summary judgment should not be granted. *Id.* at 324-25.

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to the particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

Gulf Restoration seeks partial summary judgment on liability and standing. Since Gulf Restoration has the burden of proof on these issues, Gulf Restoration "must establish 'beyond all peradventure all of the essential elements of'" these issues in order to obtain partial summary judgment. *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).

The Court has federal question jurisdiction under the Clean Water Act. 28 U.S.C. § 1331; 33 U.S.C. § 1365(a). Venue is proper in this Court, because the alleged discharges are located in Hancock County, Mississippi. 33 U.S.C. § 1365 (c)(1).

STANDING

Gulf Restoration first argues that it has organizational standing to bring this

4

action because it has three members who are damaged by Hancock's alleged violations, redressable by a favorable decision from this Court. Gulf Restoration also maintains that protecting those interests is germane to its purpose and this case does not require individual participation.

Standing is a jurisdictional issue. *Vt. Agency of Natural Res. v. United States*, 529 U.S. 765, 771 (2000). "[T]he requirement that jurisdiction be established as a threshold matter 'springs from the nature of limits of the judicial power of the United States' and is 'inflexible and without exception.'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998) (quoting *Mansfield, C. & L. M. R. Co. v. Swan*, 111 U.S. 379, 382 (1884)).

Standing is a question of law. *Rivera v. Wyeth-Ayerst Labs.*, 283 F.3d 315, 319 (5th Cir. 2002). Article III, Constitutional standing contains three elements: (1) the plaintiff must have suffered an injury in fact, (2) which is fairly traceable to the challenged conduct of the defendant, and (3) the injury must be likely redressable by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). An organization has standing where at least one of its members has standing to sue in her own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the member's participation. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). "The party invoking federal jurisdiction bears the burden of establishing these elements. . . .  with the manner and degree of evidence required at the successive

stages of the litigation." *Lujan*, 504 U.S. at 561.

I.    MEMBERS' STANDING

First, the Court examines whether Gulf Restoration has at least one member with standing in his or her own right.  In other words, is there at least one member, with an injury in fact, that is fairly traceable to Hancock County's challenged conduct and likely redressable by this Court?

An injury in fact must be concrete and particularized.  *Id.* at 560.  It must be actual or imminent and not merely conjectural or hypothetical.  *Id.*  "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity."  *Friends*, 528 U.S. at 183 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735,(1972)).  The plaintiff "must use the area affected by the challenged activity and not an area roughly 'in the vicinity' of it."  *Lujan*, 504 U.S. at 565-66.

Hancock's construction activities of filling and dredging its wetlands have caused flooding.  For instance, before the activities, the Schuengels' "property did not normally flood, even during moderate tropical episodes.  For example, [the Schuengels] experienced no flooding on [their] property when Hurricane George[s] passed over Bay St. Louis in 1998."  (Mrs. Schuengel Decl. at 7 (¶20)).  After Hancock began to fill in the wetlands, the Schuengels':

> property started to flood during mild rains. The flooding has increased as
> the construction and filling of wetlands on [Hancock's] Property has

6

> continued.  The water that has been flooding [the Schuengels'] property since [Hancock] began construction activities on [its] Property often comes as a solid flow of water from [its] Property.  The flood waters have washed soil and plants off [the Schuengels'] property, flooded the dog houses, and inundated [their] chicken coop and shed.

*Id.* at ¶21.  The area of her family's property that abuts hers is "constantly wet" and has standing water so deep that she "needs waders that reach above my knees to access the area."  *Id.* at 8 (¶22).  This is where she and her husband used to mow grass and she kept a large garden, but the flood waters have made that impossible now, by washing away plants and raising the water table.  Now she must "keep a smaller vegetable garden on my own property in a box raised above ground level."  *Id.*  The flooding also prevents them from letting their cows, goats, pigs, and dogs roam and graze there, as the Schuengels used to do.  Also, their family used to use the area for recreation, but can longer do so.  The flooding has caused an increase of pests onto the Schuengels' property, "including mosquitoes, rats, alligators, and poisonous snakes."  *Id.* at 9.  This in turn has caused the Schuengels not to allow family children to play in the area at the northern edge of the Schuengels' property.  This impairs their ability to recreate in and around their yard.

Besides the flooding, one of the things that Hancock did was to fill in a portion of wetlands to construct a berm, which "runs the length of [the Schuengels'] property, detracting from the beauty of the view."  *Id.* at (¶25).  They used to enjoy the natural view from their dining room and back porch.  Now, the view includes the unsightly constructed berm.

Besides the interests in the Schuengels' and their family's property, the

Schuengels also have recreational interests in the nearby Bayou Maron tributary, which flows through the neighboring property, and Bayou Maron, which begins immediately south of Bayou La Croix Road.  They visit these waters regularly.  In Bayou Maron, they bird watch, site see, and enjoy boating in a canoe and small skiff.  Their recreational activities have been impaired by the "increased water flow and sediment pollution caused by the clearing, dredging and filling of wetlands on the Property." *Id.* at 10 (¶27).  The increased flooding has caused both water bodies to become wider and deeper.  Whereas the tributary used to be passable on foot, now the Schuengels need knee and hip waders to cross it.  The fill that Hancock placed in the wetlands washes away into the tributary and bayou whenever it rains.  The lighter color fill material can be seen streaming through the dark clear waters of the tributary and bayou.  These events mar "the appearance and shape of [the two water bodies] making them uglier and less healthy looking." *Id.*  As a result, they do not enjoy visiting and using the two waters as they did before.

Thus, the Schuengels use the affected area and they are persons for whom the residential, recreational, and aesthetic values of the areas have been lessened by the challenged activity.  Under *Friends*, it is undisputed that they have sustained an injury in fact.  The Schuengels' injuries are fairly traceable to Hancock.

As for redressability, Gulf Restoration seeks an injunction and civil penalties.  Gulf Restoration must demonstrate standing separately for each form of relief sought. *Friends*, 528 U.S. at 185.  The redressability prong is satisfied when it "is likely, as opposed to merely speculative, that the injury will be redressed by a favorable

decision." *Id.* at 180-81.

An injunction is an exercise of prospective relief. *Salazar v. Buono*, 130 S. Ct. 1803, 1816 (2010).  Hancock's alleged violations and the Schuengels' undisputed resulting injuries are continuing.  An injunction ordering Hancock to refrain:

> from any continuing dredge and fill activity until they obtain a valid §
> 404 permit. . . . from any work at the site which will further affect storm
> water runoff at the site until they obtain a valid storm water permit. . .
> . to abate their violations of the Clean Water Act, and repair and
> remediate all damage to wetlands and adjacent property

is likely to redress the imminent future residential, economic, recreational, and aesthetic injuries to the Schuengels by eliminating or reducing the risk of flooding and sediment pollution.  (Compl. at 11 (¶¶53-55)).

As for civil penalties, Gulf Restoration does not address this aspect of standing, so the Court will not address it in ruling on the instant motion.  Because the Schuengels have at least injunctive standing, and they are members of Gulf Restoration, the Court holds that Gulf Restoration has satisfied the first prong in organizational standing.  That is, Gulf Restoration has at least two members with standing to sue in their own right.  The Court need not examine the Lang's or the Schuengels' remaining interests.

II.    GERMANE TO THE ORGANIZATION'S PURPOSE

Next, the Court examines whether the interests Gulf Restoration seeks to protect in this lawsuit are germane to the organization's purpose.  Gulf Restoration argues that the interests it seeks to protect in this lawsuit are its members's interests in clean water and in Gulf area wetlands.  These are certainly the interests shown to

9

be affected above.  Gulf Restoration's organizational purpose is to protect and restore the resources of the Gulf Region and to restore the ecological and biological integrity of the Gulf itself.  The interests in clean water and wetlands in Hancock County is thus germane to Gulf Restoration's purpose.

### III.    INDIVIDUAL PARTICIPATION NOT REQUIRED

Finally, the Court holds that no individual participation of Gulf Restoration's members is required to litigate this case.  This is because no damages are sought on behalf of the members.  Since the case does not require individualized proof of either the Schuengels', Lang's, or any member's damages, no member's individual participation is required. *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 551 (5th Cir. 2010).  According to the Supreme Court:

> *Hunt* held that "individual participation" is not normally necessary when an association seeks prospective or injunctive relief for its members, but indicated that such participation would be required in an action for damages to an association's members, thus suggesting that an association's action for damages running solely to its members would be barred for want of the association's standing to sue.

*United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996).  The declaratory, injunctive, and civil penalty relief that is sought here does not require individual participation.

There is no genuine issue of material fact as to Gulf Restoration's standing.  The Court holds that Gulf Restoration has standing to pursue this action.

<u>VIOLATIONS</u>

Gulf Restoration next argues that Hancock violated Sections 402 and 404 of the Clean Water Act.

"Except as in compliance with . . . sections . . . 402, and 404 of th[e CWA], the discharge of any pollutant by any person shall be unlawful." 33 U.S.C. § 1311(a). "The term 'discharge of a pollutant' . . . means any addition of any pollutant to navigable waters from any point source. . . ." 33 U.S.C. § 1362(12)(A). "Pollutant" means "dredged spoil, . . . rock, sand, cellar dirt and industrial . . . waste discharged into water." 33 U.S.C. § 1362(6). "The term 'navigable waters' means the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). "The term 'point source' means any discernible, confined and discrete conveyance, including but not limited to any . . . ditch, channel, . . . conduit, . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

I.    SECTION 402

"Because storm water inevitably contains pollutants such as sand and cellar dirt," the Clean Water Act regulates the discharge of storm water. *City of Abilene v. Envtl. Prot. Agency*, 325 F.3d 657, 659 (5th Cir. 2003). Section 402 requires a permit for storm water discharges associated with industrial activity. 33 U.S.C. § 1342(p)(4)(A). The Environmental Protection Agency's regulations provide:

> All storm water discharges associated with industrial activity that discharge through a storm water discharge system that is not a municipal separate storm sewer must be covered by an individual permit, or a permit issued to the operator of the portion of the system that discharges to waters of the United States, with each discharger to the non-municipal

11

conveyance a co-permittee to that permit.

40 C.F.R. § 122.26(a)(6)(I).   It is undisputed that Hancock did not apply for or obtain

such a permit.  Therefore, the Court must consider whether Hancock committed such

discharges.  Did Hancock (1) discharge into waters of the United States (2) storm water

(3) associated with industrial activity?

A.     STORM WATER

 "Storm water means storm water run off, snow melt runoff, and surface runoff

and drainage."  40 C.F.R. § 122.26(b)(13). It is undisputed that there has been and

continues to be storm water and surface run off and drainage from Hancock's property.

Particularly, when it rains, storm water and resulting erosion runs off and drains from

the property.

B.     ASSOCIATED WITH INDUSTRIAL ACTIVITY

"Storm water discharge associated with industrial activity" includes "storm

water discharges from . . . areas where industrial activity has taken place in the past

and significant materials remain and are exposed to storm water."  40 C.F.R. §

122.26(b)(14).  Specifically:

> The following categories of facilities are considered to be engaging in
> 'industrial activity' for purposes of paragraph (b)(14): . . . Construction
> activity including clearing, grading and excavation, except operations
> that result in the disturbance of less than five acres of total land area.
> Construction activity also includes the disturbance of less than five acres
> of total land area that is a part of a larger common plan of development
> or sale if the larger common plan will ultimately disturb five acres or
> more.

40 C.F.R. § 122.26(b)(14)(x).  It is undisputed that Hancock conducted clearing,

12

grading, and excavation on its property and that these fill materials remain on the property in the form of mounds, roads, canals, berms, and ditches.  It is undisputed that these are exposed to storm water and that storm water discharges occur from these areas.

The question that remains is whether these construction activities disturb at least five acres, or, if not, whether the activities are part of a larger common plan of development or sale that will ultimately disturb at least five acres.  Gulf Restoration argues that both of these apply.  First, it posits, "Photographs and eyewitness accounts show that HCD's Construction Activities, including dredging and filling of ditches, berms, mounds, dams, canals, and roads, have disturbed more than five acres."  (Pl.'s Mem. Summ. J. at 7).  Gulf Restoration points to Mrs. Schuengel and Lang's declarations and accompanying pictures.  None of these give the Court any guidance on how many acres are disturbed.  While accompanying maps indicate at least five acres could be disturbed, the Court cannot say as a matter of law that they are.

Gulf Restoration next argues, "The plans for the Town of Stennis also show that those disturbances are part of a larger plan of development that would ultimately disturb as much as 700 acres." *Id.*  Plans for the Town of Stennis plus the county maps show that there is a larger plan of development that would disturb at least 703 acres, if not more.  The canals, roads, and clearings, and land filling that Hancock has already performed follow the plans for this development project.  Thus it is undisputed that Hancock was performing industrial activity, and the storm water runoff was associated with that industrial activity.

13

C.    Discharged into United States Waters

The next element Gulf Restoration must prove is that this storm water was discharged or is discharging into United States waters.  It is undisputed that the storm water run off from the fill and dredged material washes away into the Bayou Maron tributary and into Bayou Maron itself.  The Schuengels and Lang provide affidavits and photographs demonstrating this fact.

"'[W]aters of the United States' include only relatively permanent, standing or flowing bodies of water." *Rapanos v. United States*, 547 U.S. 715, 733 (2006) (plurality, Scalia, J.).  This includes "streams" and "rivers." *Id.* at 733-34.  This of course includes bayous.  *United States v. Holland*, 373 F. Supp. 665, 675 (M.D. Fla. 1974).

It is undisputed that Bayou Maron is a "relatively permanent, standing or flowing bod[y] of water."  The dictionary defines "bayou" as "1: a creek, secondary watercourse, or minor river that is a tributary to another body of water.  2: any of various usually marshy or sluggish bodies of water."   http://www.merriam-webster.com/dictionary/bayou.  The county has built a permanent bridge over Bayou Maron.  It is marked on county maps.  It is a permanent, flowing tributary of a larger bayou, Bayou La Croix, which is a permanent, flowing tributary of the Jourdan River, which empties into the Bay of St. Louis, which empties into the Gulf of Mexico.  The Schuengels and Lang aver that they have often gone canoeing and boating into Bayou Maron and La Croix.

Additionally, the Bayou Maron tributary is undisputedly a permanent, flowing stream.  This stream can be seen on county maps as well as an aerial photograph.

14

Lang has lived on his property for more than sixty years, and he testified that the tributary "runs through my property from the north until the bridge at Bayou La Croix Road.   Immediately before reaching my property, the waters of the Bayou Maron tributary stream along [Hancock'] Property's western boundary line.   The tributary reaches [Hancock's] Property after traveling under Interstate 10 through a concrete tunnel."  (Lang Decl. at 1 (¶5)).  Mrs. Schuengel has lived at her home for more than twenty years, less than a mile away from Bayou Maron.  She gave the same physical description and location of the tributary and testified that the Bayou Maron tributary "has run through my father's property for as long as I can remember."  (Mrs. Schuengel Decl. at 2 (¶9)).

It is therefore undisputed that Hancock has caused and is causing storm water associated with industrial activities to be discharged into waters of the United States without a Section 402 permit.  Because there is no genuine issue of material fact on these elements, Gulf Restoration is entitled to judgment as a matter of law that Hancock violated Section 402.

II.    SECTION 404

Section 404 of the Clean Water Act requires a permit for the "discharge of dredged or fill material into the navigable waters."  33 U.S.C. § 1344 (a).  There are exceptions, none of which apply here.  33 U.S.C. § 1344(f),( r).  Gulf Restoration argues that Hancock violated this section by discharging dredged and fill material into the wetlands on Hancock's property.

"The term dredged material means material that is excavated or dredged from

waters of the United States." 33 C.F.R. § 323.3(c). The "term discharge of dredged material means any addition of dredged material into, including any redeposit of dredged material other than incidental fallback within, the waters of the United States." 33 C.F.R. § 323.3(d)(1). "Fill material" includes "material placed in waters of the United States where the material has the effect of . . . Replacing any portion of a water of the United States with dry land." 33 C.F.R. § 323.3(e)(1)(i). Non exclusive examples are "rock, sand, soil, clay, plastics, construction debris, wood chips, overburden from . . . excavation activities, and materials used to create any structure or infrastructure in the waters of the United States." 33 C.F.R. § 323.3(e)(2). "Discharge of fill material" means "the addition of fill material into waters of the United States." 33 C.F.R. § 323.3(f). This "generally includes, without limitation . . . . site development fills for recreational, industrial, commercial, residential, or other uses; . . . road fills; dams and dikes; . . . property protection and/or reclamation devices . . . berm." *Id.*

The undisputed evidence is that Hancock dredged its wetlands[2] and then discharged that dredge and other fill materials into the wetlands, and plans to continue to do so. The material was used to build canals, fill canals, relocate canals, construct berms and roads, and fill in wetlands for the construction of a planned

---

[2] The Corps of Engineers's regulations define wetlands as "those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs, and similar areas." 33 C.F.R. § 328.3(b).

community development. The material is also stored on Hancock's property in mounds. Hancock admits that it did not have a permit to do so.

Hancock nevertheless argues that Gulf Restoration is required to put on expert testimony that the areas in question constitute wetlands. The Court disagrees. Among the evidence that the activity occurred in wetlands are maps from the United States Fish and Wildlife Service delineating and designating the areas in question as freshwater emergent wetland and freshwater forested/shrub wetland. This agency has the authority to make this determination and create a National Wetlands Inventory for the purpose of conserving the wetlands of the United States. 16 U.S.C. § 3931(a); 50 C.F.R. § 84.11. The statutory mandate defines "wetland" to mean "land that has a predominance of hydric soils and that is inundated or saturated by surface or groundwater at a frequency and duration sufficient to support, and that under normal circumstances does support, a prevalence of hydrophytic vegetation typically adapted for life in saturated soil conditions." 16 U.S.C. § 3902. This suffices under the CWA. 33 C.F.R. § 328.3(b). Furthermore, one of the purposes of the National Wetlands Inventory is to assist in the development and operation of programs under the CWA. *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 138-39 (1985). The National Wetlands Inventory maps therefore are competent evidence on the issue of whether or not an area is classified as a wetland under the CWA. *United States v. Wilson*, 133 F.3d 251, 254 (4th Cir. 1997).

The question then, that remains, is whether it is undisputed that the wetlands at issue constitute waters of the United States. "Waters of the United States" include

"wetlands adjacent to the 'waters of the United States.'" *Riverside*, 474 U.S. at 135. *See also* 33 C.F.R. § 328.3(a)(7). "The term adjacent means bordering, contiguous, or neighboring. Wetlands separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes and the like are 'adjacent waters.'" 33 C.F.R. § 328.3(c).

In *Rapanos*, the Supreme Court previously attempted to define when a wetland is adjacent to waters of the United States. Unfortunately, no opinion commanded a majority of the Court. Justice Scalia, writing for a four justice plurality, opined that wetlands are covered by the Act when (1) "the adjacent channel contains a 'wate[r] of the United States,' (i.e., a relatively permanent body of water connected to traditional interstate navigable waters); and [(2)] the wetland has a continuous surface connection with that water, making it difficult to determine where the 'water' ends and the 'wetland' begins." *Rapanos*, 547 U.S. at 742. Justice Kennedy concurring in the judgment only, wrote the test was that the "wetland must possess a 'significant nexus' to waters that are or were navigable in fact or that could reasonably be so made." *Id*. at 759 (quoting *Solid Waste Agency of N. Cook Cnty. v. United States Army Corps of Eng'rs*, 531 U.S. 159, 167 (2001)). "[W]etlands possess the requisite nexus, and thus come within the statutory phrase 'navigable waters,' if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other waters more readily understood as 'navigable.'" *Rapanos*, 547 U.S. at 780. Finally, the four justice dissent, written by

18

Justice Stevens, maintained that the Corps of Engineers's determination that wetlands adjacent to tributaries of traditionally navigable waters is reasonable. *Id.* at 788.  In its only opinion to date examining *Rapanos*, the Fifth Circuit affirmed a judgment of conviction from this Court, finding there was sufficient evidence under all three *Rapanos* approaches.  *United States v. Lucas*, 516 F.3d 316, 327 (5th Cir. 2008).

The evidence shows that the wetlands at issue border the Bayou Maron tributary.  They are also part of a contiguous body of wetlands that extend beyond Hancock's property and border, at a minimum, the tributary, Bayou Maron, and Bayou La Croix as well.  As discussed previously, the Bayou Maron tributary is part of the "waters of the United States," because it is a permanent, flowing stream and it is connected to traditional interstate navigable-in-fact bodies of water: Bayou Maron, Bayou La Croix, the Jourdan River, and the Bay of St. Louis.  Therefore, the three adjacent channels are waters of the United States, and satisfy the first prong of the *Rapanos* plurality's test.  The second prong is also undisputed by the evidence.  For example, Mrs. Schuengel and Lang swore that prior to and after Hancock's construction, it was difficult to see where the waters belonging to both the Bayou Maron tributary and Bayou Maron ended and where the waters of the wetlands began.  Therefore, the undisputed evidence is that the wetlands at issue are "waters of the United States" under the *Rapanos* plurality opinion.

The wetlands at issue also satisfy Justice Kennedy's approach.  The wetlands have a significant nexus to waters navigable-in-fact or reasonably made so, because the wetlands significantly affect the chemical, physical, and biological integrity of those

19

other waters.  It is undisputed that the filling in and alteration of the wetlands has contributed to increased flooding and pollution of the downstream Bayou Maron, for example. This is sufficient evidence of a significant nexus.  *Lucas*, 516 F.3d at 327.

In sum, it is undisputed that Hancock discharged dredged and fill material into wetlands adjacent to waters of the United States and did so without a permit, in violation of Section 404.

**IT IS THEREFORE ORDERED AND ADJUDGED** that for the reasons stated above Plaintiff Gulf Restoration Network's [58] Motion for Partial Summary Judgment should be and is hereby **GRANTED.**  The Court holds as a matter of law that Gulf Restoration has standing, and that Defendant Hancock County Development, LLC, has violated Sections 402 and 404 of the Clean Water Act.

**SO ORDERED AND ADJUDGED** this the 22nd day of February, 2011.

s/ *Louis Guirola, Jr.*
LOUIS GUIROLA, JR.
CHIEF U.S. DISTRICT JUDGE

20